Filed 06/18/26

VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 24-CV-01896

---

Lorie LaRock v. Tyler Fisk et al

---

## TRIAL DECISION

Plaintiff LaRock built a tiny slab house on River Road in Duxbury. Defendants, the Fisk family, own the property where LaRock built her house. At the time LaRock built the house, LaRock's daughter, Leigh-Ann Ravelin, had a romantic relationship with Tyler Fisk. Tyler's parents, Shane and Cathy, had co-signed the note on the property, making them co-owners. During their relationship, Ravelin, her four children and Tyler lived in Tyler's house on the property. Not long after LaRock moved into her tiny house, Ravelin and Tyler broke up. Ravelin and her children moved out. LaRock and Tyler remained on the property, along with their houses. Relations among the parties frayed. This case followed. By the time of trial, LaRock had left the property permanently and abandoned her tiny house which remains on the Fisks's property.

Trial took place May 26-28, 2026.[1] All parties had counsel. Tyler and his parents had separate counsel. Through the course of trial, the parties' claims narrowed. This decision addresses the remaining claims: LaRock's counts 3 (unjust enrichment) and 4 (private nuisance) and the Fisks's counterclaims 1 (trespass) and 3 (unjust enrichment). The court disposed of LaRock's counts 1 (oral contract) and 2 (promissory estoppel) and defendants' counterclaims 2 (ejectment) and 4 (declaratory judgment) with findings and rulings on the record, following opposing parties' Rule 52(c) motions. All parties filed post-trial briefs on June 12.[2]

### I.      Findings of Fact

#### A.  Preface

This section summarizes the trial court findings based on the evidence most relevant to the remaining claims.[3] It cites exhibits for convenience. The court has considered all of the evidence, whether cited or not.

---

[1] Trial took place on May 26-27 in Montpelier. The IT department did an after-hours upgrade to the FTR system in Montpelier on May 27. On May 28, the FTR system in Montpelier did not work. Trial relocated to Barre on May 28 where it concluded.

[2] In their post-trial briefs, the parties briefly address the economic loss rule. The court's findings and conclusions on other matters make that dispute unnecessary to resolve, and the court does not address it for that reason.

[3] The court offers fulsome findings now in the hope of limiting future remands. The court has chosen the untraditional structure of the findings section with the same hope.

Unless otherwise noted, the descriptions under the witnesses' respective sections reflect their trial testimony as found by the court. The sections say what the witness said as found by the court, without tediously repeating what they "said" or "testified to" and what the court explicitly "found." The court's written findings resulted from it sifting through the trial testimony to state the facts based on the witnesses' respective testimony. *See New England P'ship, Inc. v. Rutland City Sch. Dist.*, 173 Vt. 69, 74 (2001) ("It is the duty of the court, in making findings of facts, to sift the evidence and state the facts . . . to make a clear statement to the parties . . . of what was decided and how the decision was reached.") (citation and internal quotations omitted).

In places, the court emphasizes certain findings regarding particularly disputed areas of testimony, outlining the bases for its findings. When the court otherwise describes witness testimony, that description contains the court's inherent findings—it recounts the testimony of witnesses that the court implicitly deemed credible and reliable. See *Krupp v. Krupp*, 126 Vt. 511, 514 (1967) (cautioning courts that a "recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed").

LaRock's trial witnesses were LaRock, Ravelin, Dale Cubit, Kevin Lavanway and Tyler, in that order. Defendants called Tyler, Shane and Cathy. In LaRock's rebuttal case, she recalled Lavanway and herself.

Based on a preponderance of the credible evidence admitted at trial, the court makes the following findings of fact, focusing on the matters most relevant to resolving the parties' remaining claims.

## B. Lorie LaRock's Trial Testimony

LaRock knows Cathy from high school. LaRock graduated in 1975. Around 2001, LaRock met her husband, Fred LaRock. LaRock, Fred, Cathy and Shane socialized regularly at each other's homes. They hosted each other for dinners, impromptu get-togethers and hanging around their garages. They visited each other at least weekly. Their gatherings included Lavanway and Cubit. Fred, Shane, Lavanway and Cubit had gone to school together.

Fred died of cancer in 2012. LaRock stayed in their marital home. Around 2020 during COVID, LaRock realized she no longer wanted to remain there. She spoke to her children about selling. She started measuring out how much space she actually needed.

In 2021, Ravelin and Tyler had been discussing the possibility of building a garage with an apartment above for LaRock. At that time, Ravelin and Tyler had shared a romantic relationship for eight years and lived together in Tyler's River Road home, along with Ravelin's children. Tyler suggested LaRock could help with building expenses for the apartment. They mostly discussed the layout of the potential building, details like the location of the stairs and septic. They did not have drawings. They did not discuss other arrangements.

According to the running joke within the families, Tyler's sister, Ashley, would take care of Shane and Cathy as they aged. Ravelin would take care of LaRock as she aged. It would help to have LaRock nearby, especially with her grandchildren of Ravelin's.

The garage and apartment never happened. LaRock does not know why exactly. She thinks finances and structure size had something to do with it.

LaRock then shifted to thinking about building a tiny house somewhere. Tyler invited LaRock to build it on his land on River Road. LaRock found Tyler's offer quite generous. He had even staked out a spot on his land for her house. Tyler would handle permitting and site preparation. He had an excavator. LaRock would pay all the costs, including septic, water, electric and materials like fill and building supplies. Based on the kit dimensions LaRock was then considering from Jamaica Cottage Shop, Tyler drew up a plan on a permit, including a driveway and lawn for LaRock's house.

LaRock offered text exchanges from October 2021. In some, she discusses with Ravelin her upcoming visit to the cottage shop in South Londonderry. Ex. 3 at 1-2. In others, she discusses the size and the permit application with Tyler. Ex. 4 at 1. Tyler calls LaRock "Nanny." Their exchange includes a pleasant exchange of thank you and you're welcome.

No one said anything about rent. LaRock designed the home as her "forever home." LaRock talked about it becoming Ravelin's and Tyler's after LaRock died. She understood she could stay there until she died and explicitly had that discussion with Tyler. She would also cover property taxes and insurance. Since Tyler had a property management business, he would mow and plow LaRock's area.

Ultimately, LaRock decided not to buy from Jamaica Cottage Shop. The kit of unassembled materials would have cost $30,000-$50,000. *E.g.*, Ex. D at 7. She found herself with more questions than answers. She visited the shop with Lavanaway. She knew he had built many houses. He believed he could build a better house for less money. She would help build it.

In May 2022, LaRock drew up a floor plan. Ex. 7. She based it on what she had seen at Jamaica Cottage Shop. Tyler completed a zoning permit application for an accessory building. Ex. C. LaRock did not see it at the time. Tyler sketched the plan in the application. Ex. C at 4.

Throughout this time, LaRock understood Tyler owned the River Road property by himself. She knew Shane and Cathy had lent Tyler money for a down payment. She understood Ravelin and Tyler had to pay Shane and Cathy back. Tyler never said anything about needing to talk to Shane and Cathy about LaRock's house plans. LaRock did not learn about Shane's and Cathy's part ownership until after she had moved into her house and saw a property tax bill with their names on it. LaRock never discussed her tiny house plans with Shane and Cathy before construction started.

Once construction on LaRock's tiny home started, Shane helped. He helped bring building materials and even with construction. For instance, Ex. 9 at 8 shows Shane in a red shirt helping with framing and Cathy on the job site seated under a tent. LaRock talked to Shane

3

and Cathy during this time about LaRock living on the property. Shane and Cathy expressed that it would be great to have LaRock nearby for the grandchildren.

The rest of Ex. 9 shows LaRock's tiny home during various phases of construction. It began with Lavanway milling timber into lumber. Ex. 9 at 1, 2. The photos also show Lavanway, Cubit, Shane, Ravelin and others participating in different phases of construction, from site prep through interior finish. Lavanway custom milled and built the interior doors and loft railing. One time during construction, LaRock recalled a conversation when Lavanway indicated the house would some day be a good place to sell or rent. Tyler responded that he and Ravelin probably would not sell because one of their four kids would probably end up living there.

The photos do not depict LaRock, who took them. She and Lavanway did most of the work. Cubit did site prep, driveway, lawn, septic digging and tank installation and septic mounding. Shane helped with construction, cutting and handing materials up for roofing. Ravelin hauled materials since she has her own trucking business. Ravelin also did some excavator work, as shown in Ex. 9 at 19 with Ravelin operating an excavator to backfill the conduit trench. Ravelin did not bill for her work. LaRock reimbursed her for fuel and materials.

Tyler helped without LaRock asking him to do so. He did some site prep. He made a portion of the driveway grade less sleep. He also enlarged the site of her lawn. Ex. 3 at 6-7 are texts between LaRock and Tyler regarding her lawn. Ex. 2A is an aerial photo of the River Road property from the 2025 timeframe with LaRock's handwriting from trial designating her house, Tyler's house, their driveways and other features of the property.

Altogether, LaRock estimates she spent at least $62,950 to build her house. Ex. 10. Cubit did not bill for his work. She told Lavanway she would pay him something. She paid him $5,000 for his labor. Ex. 10 at 95. She wrote separate checks to him and others for materials and fuel.

Those amounts do not include what LaRock calls her sweat equity. She has some background in construction. Fred had worked as a construction contractor. For three years, LaRock worked with him part time. He built houses, decks and anything else residential. She helped, doing roofing and other tasks.

In building her house, LaRock did a variety of work. She moved materials, helped frame the forms for pouring the slab, installed foam board and watered the concrete as it set. She helped anchor the first boards to the slab, frame the walls, install the loft flooring and hang sheetrock. She did all the interior and exterior painting and helped install the tin roof. For site prep, she helped lay electrical and fiber conduit and seed and mulch the lawn. She constantly did site cleanup. She helped install the stairs, door, cabinets and windows. From the time construction began with the lumber milling in April 2022 until she moved into the house in May 2023, LaRock estimates she was on the work site every day of the week for about 75% of the time, except for the months of November 2022 through January 2023 when she took care of her dying mother. Pricing her labor at $25 per hour, she estimated her total sweat equity at around

an additional $20,000.  By the court's calculation, $20,0000 at $25 per hour equates to 800 hours of labor.

The tiny house is priceless to LaRock.  She thinks she could sell it for $150,000.  She has never tried to sell it and does not know how much it would fetch.  She thinks the tiny house could be rented for $1,000 per month.

Ravelin and Tyler broke up on Oct. 1, 2023.  On Oct. 24, 2023, a text exchange between LaRock and Tyler shows Tyler still calling her "nanny" and giving her advance warning of shooting to sight his guns.  Ex. 3 at 8.

Shane and Cathy spoke to LaRock two times around this time.  First, on Sep. 28, 2023, Shane and Cathy came to LaRock's house to talk to LaRock about what she wanted to do, given Ravelin's and Tyler's break-up.  Shane and Cathy spoke to LaRock to take it off of Tyler's plate of worries at the time.  They talked about subdividing the land for LaRock's house with her sharing the legal fees.  They had all spoken to Lavanway as a mutual friend at the time.  LaRock reiterated she did not want to move and Shane said she would not have to do so.

On Oct. 31, 2023, Shane and Cathy returned to LaRock's.  Cathy said they had consulted a lawyer who advised that LaRock's house belonged to Tyler since it was on his property.  LaRock asked whether they had consulted Lavanway and they said they had not.  LaRock accused Tyler of cheating on Ravelin.  Cathy got upset and told LaRock she could "get the fuck out."  Some time later, they told LaRock they wanted her tiny house removed.

Texts exchanged between LaRock and Tyler show a similar breakdown in relations.  Those texts relate to Tyler trying to get Ravelin to return his computer for his business, Go Time Property Management.  When Ravelin declined, Tyler asked LaRock to intervene.  LaRock declined and Tyler threatened to disconnect her water supply.  Ex. 3 at 9-14.  LaRock did not drill a well for her tiny house due to its $20,000 expense.  Instead, the water for LaRock's house comes from Tyler's well.

LaRock's and Tyler's texts in January 2024 show an argument taking shape over plowing LaRock's driveway.  Tyler declined to plow, citing what Ravelin was "putting [him] through."  Tyler informed LaRock that Ravelin could no longer enter his property at 3105 River Road.  LaRock's address is 3151 River Road.  Their houses are 177 feet apart.  LaRock retorted: "I didn[']t expect that you would plow.  Just showing some respect.  Something you don't seem to recognize.  All good."  Ex. 3 at 16-17.

LaRock sought legal advice about who could visit her.  On Jan. 23, 2024, Tyler posted no trespassing signs on either side of LaRock's driveway.  LaRock concedes that all of the River Road property land, even under her house and driveway, belongs to Tyler and his parents so he had the legal right to post his property.  Tyler also installed game cameras near her driveway.  LaRock acknowledges he had the right to do so as property owner.

While Ravelin and three or four of her children lived with Tyler at different times, LaRock never knew Tyler's house to have water supply problems.  She noted they used to have a

pool there to fill.  In April 2024, LaRock found her water supply had reduced.  With the intervention of the parties' lawyers, normal water supply resumed.

In May 2024, LaRock learned from the Fisks's lawyers that she was not allowed to mow, trim or be on the lawn outside her house.  Nevertheless, she weed-whacked around the perimeter of her house for maintenance.  Tyler drove up and yelled, "not allowed."  He walked around her house.  She could not see him.  She heard a loud thump on her wall.

That began what LaRock describes as Tyler "excessively" driving by her house.  He began driving by her house daily on his tractor or ATV.  Ex. 14 is a photo LaRock took in May or June 2024 of one such instance.  LaRock described Tyler as "looking into" her house.  The photo depicts Tyler looking at an angle but away from her house.  He wears sunglasses so his eyes and their direction are not visible.  LaRock estimated the tractor in this photo at about five feet from her house.  From the scale of him, the tractor wheel and from the court's having seen Tyler over the three-day trial, the court concludes the tractor is between five to ten feet away from LaRock's house.  The court finds those observations consistent also with a videorecording of Tyler driving by LaRock's house on his tractor.  Ex. Q.

Beginning May 2024, Tyler placed personal property around LaRock's house.  Ex. 15 contains five photos LaRock took.  They depict items like property management and farming equipment, tires, a tarp shed, a snow machine and basketball hoop.  The court observes that none of the items touch LaRock's house and that some of the material appears within two feet or less of the exterior walls.  Tyler never stored materials in this area previously.  Those materials remained at least through September 2024.  At some point, a court order required Tyler to move the materials at least 10 feet away from LaRock's house and he did so.

In July 2024, Tyler installed what LaRock describes as a "gate" at the foot of her driveway.  The photos in Ex. 17 depict two apparently 6'x6' wood posts, guyed by rope and connected with a cable across the driveway.  Ex. 17 at 1.  A combination lock secures the cable.  Ex. 17 at 3.  When LaRock found herself locked out, she parked at the cable and walked up her driveway.  Tyler then posted a no parking sign in that location.  Ex. 17 at 2.

LaRock had trouble unlocking the cable because of its tension.  She had asked Tyler to loosen it but he did not.  In the winter, LaRock would leave the cable unlocked on days for the driveway to get plowed.  Except on two occasions, LaRock returned to an unplowed driveway with the cable relocked.

On July 23, 2024, LaRock received a letter indicating that Tyler's well would run dry if LaRock remained on it.  The letter informed her she needed to make other water arrangements as they would shut off the current supply.  They did so on Sep. 1, 2024.

LaRock arranged a temporary water supply through Lavanway and Cubit.  They mounted a system on a trailer that they connected to LaRock's house.  LaRock unlocked the cable so they could tow the system up her driveway.  Tyler came to her house not long afterward and told her she needed to remove the trailer.  Tyler accused her by text of giving the cable lock combination to Lavanway and Cubit.  When LaRock left her house for an errand, she returned to find herself

6

locked out. The combination no longer worked. The water trailer was gone. With the assistance of the parties' lawyers, LaRock had Lavanway reconnect the water trailer.

On September 17, 2024 at around 7 pm, LaRock was watching TV at her house. She heard Tyler drive up to her house. She heard a loud bang which she recognized as a gun shot. LaRock has great familiarity with firearms. She used to shoot with Tyler from Tyler's deck at River Road. She owns firearms herself. This time, she could not see Tyler or where he was shooting from or at. She went to her utility room because it has no windows. She could hear Tyler loading the gun and she could smell gun powder. After about 15 minutes, LaRock exited her utility room and went to the loft. She felt safer there, even though it has a window. She recorded the activity from that point. Ex 23. LaRock texted Ravelin during the time in the loft. Ex. 4 at 9-12. They both wish the gun "would back fire and blow up in his face." *Id.* at 11. From her shooting experience, LaRock recognizes the gun as "Probably pups 30-06." *Id.* When Tyler finished shooting, LaRock heard him yell something.

In her real-time texts with her daughter, LaRock wrote, "I fe[e]l kind of frozen in place. I'm afraid to leave and to stay." *Id.* at 12. When Ravelin replies, "He's not going to hurt you. It's all scare and intimidation tactics," LaRock writes, "I hope he[']s not, but I[']m not 100% sure of that." *Id.* The two text about LaRock getting a restraining order but LaRock fears that could backfire with Tyler, "He won[']t be able to handle that on 'his property'!!" *Id.* at 13. Instead, she writes that she "will go back to Erica's tomorrow night. Seems Tyler needs a break from me." *Id.* At 7:27 pm, LaRock noted "He's done . .. for now!" *Id.* at 11. She testified that the shooting ended after 8 pm.

Considering all of the evidence regarding this shooting incident, the court finds LaRock's testimony exaggerated its impact on her. She had shot firearms with Tyler before at this property. She had known Tyler for at least nine years. She testified to no history of physical or gun violence involving Tyler. She had enough experience with firearms and presence of mind during the incident to recognize the sound as "Probably pups 30-06." Ex. 4 at 11.

LaRock did not convincingly explain her choice of observation locations. She started in the utility room because it had no windows. As the shooting continued, she went to the loft which has a window. She did not say why she made the change to get above the shooter. Nor does any of her testimony indicate that the house construction would have shielded her better in the loft than in the utility room.

LaRock had the presence of mind to text Ravelin during the incident. That text exchange appears rational, composed and lucid. LaRock did not, for instance, call the police. The audio she created and played in court did not reflect unusually loud gun shots. Ex. 23.

For these reasons, the court finds that Tyler discharged a firearm repeatedly near LaRock's house on Sep. 17, 2024. The court does not credit LaRock's testimony that the incident had a disproportionately upsetting impact on LaRock. The court accepts that the incident left LaRock rattled in the context of someone who has experience with firearms, shooting firearms with Tyler in particular, a nonviolent relationship with Tyler of nearly a decade

given his romantic and nonviolent relationship with LaRock's daughter and the presence of mind during the incident to text lucidly with Ravelin.

By Oct. 5, 2024, LaRock and Tyler had reached an agreement regarding shooting, water, Tyler's personal property stored around LaRock's house and the driveway cable. Tyler moved his personal property ten feet away from LaRock's house as agreed. Ex. 2. No recurrence of the Sep. 17, 2024 shooting incident occurred. LaRock and Tyler continued to bicker about the driveway cable because the winter temperatures sometimes froze the lock. LaRock used a propane torch to defrost it and Tyler complained about it melting the cable coating, making the cable vulnerable to rust. Ex. 3, at 29-40.

Getting her driveway plowed remained a challenge for LaRock. Not only due to the sometimes frozen lock, but because Tyler requested insurance verification from people not associated with this case. *Id.* Tyler also staked LaRock's driveway at a nine-foot width, too narrow for a typical plow to pass without knocking over the stakes with snow. LaRock could not find someone willing to plow.

In January 2025, Tyler began riding his snowmobile near LaRock's house. On the evenings before Jan. 13, 16 and 19, 2025, Tyler had ridden his snowmobile near LaRock's house. She took photos the following mornings. She counted the laps he rode around her house, ranging from 12 to 62. Some of the tracks come within 18" of her house. Ex. 19 at 4.

From the court's observation, the photos do not clearly depict as many tracks and laps as LaRock says she counted. The photos show multiple tracks, perhaps as many as a dozen, but not the 106 that LaRock counted over those three days. Ex. 19. The photos also do not depict fresh snow that might have covered prior days' tracks. From these observations, the court finds that only a small subset of Tyler's snowmobile laps, at most a dozen, took place within a driveway's width of LaRock's house. Because LaRock's photos do not square with her testimony, the court finds her testimony exaggerated—either Tyler did not take as many laps as LaRock testified or he did not take as many laps as close to her house as her testimony implied.

In February 2025, LaRock moved out of her tiny house. She had been in and out of the house during the winter of 2024-25, often staying with her sister or in a house Lavanway was trying to sell. Since leaving, she has rented a property for $1,500 per month where she still lives. She last returned to the tiny house in November 2025 to retrieve most of her belongings with a rental truck. She has some personal property remaining there that she would like to retrieve. She no longer wants to return to live there.

In some more recent texts, LaRock took to referring to Tyler as "FF," short for "Fuck Face."

LaRock concedes there exist no written agreements to memorialize any of her understandings about the tiny house situation on the Fisks's property. She has nothing in writing regarding how long she had permission to live in the house, the understanding regarding her payment of rent, property taxes or insurance. She acknowledges she never paid any rent, property taxes or insurance to the Fisks. She knows Ravelin told her insurance increased $307

but does not know if that increase represented a monthly, quarterly, annual or other increase. Ex. 4 at 4. She never offered to pay it in any event. She admits she has no interest in the Fisks's land, including the land beneath the tiny house.

When LaRock began building her tiny house, she knew that infidelity existed in Ravelin's and Tyler's relationship from 2019. LaRock knew Ravelin had two prior marriages and had begun her relationship with Tyler while still in her second marriage. LaRock trusted Ravelin and Tyler would work things out. She never thought about what would happen if their relationship ended. She just thought she would live there until she died and the house would become theirs.

### C. Leigh-Ann Ravelin's Trial Testimony

Ravelin is LaRock's daughter. Ravelin has known the Fisks for 20-30 years. Her parents had been best friends with Shane and Cathy. They were together frequently. Everyone helped everyone. They were often in the Fisks's shop working on cars. Her parents helped Shane and Cathy finish their basement.

Ravelin began her romantic relationship with Tyler in 2012. Ravelin was still married when she started dating Tyler. Ravelin and Tyler lived together at Tyler's since 2013. Her oldest child may not have moved in until 2017. They lived with Tyler until their breakup.

Ravelin had no problems with the water supply while they lived together. She recalls one time when she had left the hose running to fill the pool for a number of hours all day. She did not remember doing so until she went to turn the water on at the kitchen sink and found only a trickle. She went out and turned off the hose. Water in the kitchen returned to normal in about ten minutes.

Ravelin's relationship with Tyler was generally good, despite its ups and downs. His infidelity was a problem that they dealt with. Tyler promised to do better and stop. Ravelin always thought they would work things out. They stayed together for ten years.

Ravelin did not discuss Tyler's infidelity with LaRock. Ravelin found it embarrassing. She thought Tyler would stop. She did not want to worry her mother or for her to judge him. She did not want others to know about it, even though in hindsight she understands many did.

Ravelin knew Shane and Cathy co-owned the River Road property with Tyler. She never told LaRock. Tyler did not want people knowing his parents had co-signed. They referred to it as "his" or "our" property, never "theirs" as in Shane and Cathy's. Tyler's parents never tried to assert ownership or control over the property.

The Fisks and Ravelin talked about refinancing the property with Ravelin replacing Shane and Cathy. They made her feel as if the land was hers and Tyler's to do with what they pleased. Tyler's parents were not involved in much decision making about the property.

The first talk of LaRock moving onto the property came in 2021. Tyler initiated the idea. He had a huge heart for LaRock. The running joke was that Ravelin and Tyler would take care

9

of LaRock as she aged.  Tyler's sister would take care of Shane and Cathy.  Ravelin and Tyler wanted a big shop.  Originally, they thought they could put an apartment for LaRock on top.  After sketching it out, they realized the building would look ridiculous because of its size.  Also, they questioned whether it made sense for LaRock to have to go up and down stairs in a place where she planned to live out the rest of her life.  Even so, they all talked like LaRock would pay for the apartment portion of the project.

After they all decided against the shop-with-apartment idea, Tyler asked about building a house in the field.  Tyler showed Ravelin a spot he had staked out.  LaRock ultimately built her tiny house on that spot.  Tyler said the house should be 20' by 30'.  They discussed it would be built on a slab.  They understood Ravelin and Tyler would inherit it.  They all understood LaRock would pay for the site improvements and construction of the house, that LaRock would live there the rest of her life, that LaRock would pay utilities, property taxes and insurance increases.  Shane and Cathy supported the idea, but Ravelin cannot recall whether Shane and Cathy knew about the property tax and insurance discussion specifically.  Ravelin just knew Tyler kept Shane and Cathy informed about everything in general.

Ravelin assisted in the construction of LaRock's house.  Ravelin owned a trucking company and has for six years.  She drives a tri-axle dump truck.  Her company has two.  They haul materials for driveways, septic systems, foundations and the like.  For LaRock's house, she hauled driveway materials, septic sand and foundation stone.  She also helped with the excavator, Ex. 9 at 19, even though neither she nor Tyler were experienced operators.

LaRock repaid Ravelin for fuel and materials.  Ravelin would use fuel from the 1,000-gallon tank near Tyler's garage.  Ravelin's business, HB Hauling, paid for that fuel.  Ravelin did not charge LaRock for her time which she usually charges at $110 per hour.  Ex. 10 at 27, 29, 33, 34, 53, 60, 61 and 77 represent some of LaRock's payments to Ravelin for fuel and materials.

Tyler had done some site work for LaRock's house.  He did not charge for his time which he usually charges at $80 per hour.  Shane and Cathy eventually asked Cubit to take over to take it off Tyler's plate.

After Ravelin moved out in October 2023, she learned of tension between LaRock and Tyler.  Tyler would get angry at Ravelin and take it out on LaRock.  Ravelin saw Tyler's emotional state deteriorating during this time.  Ravelin observed LaRock often upset during this timeframe.

Ravelin knows LaRock has no written agreements with any of the Fisks for any of the arrangements regarding her tiny house.  Ravelin never heard of LaRock talking about getting a written agreement.

The court found Ravelin's testimony regarding the finances for her business and Tyler's particularly credible and convincing.  Defense counsel cross-examined Ravelin regarding the laptop Ravelin took from Tyler that contained records for Go Time Property Management.  Ravelin's answers refuted the suggestion that her having Tyler's business laptop made tracing fuel costs impossible for anyone else.  Ravelin testified that her business paid for the fuel in their

10

1,000-gallon tank used to fill her dump truck for hauling materials for constructing LaRock's tiny house. To purchase the fuel, her business used a Citibank credit card tied to an HB Hauling bank account. When defense counsel suggested that no one could verify her assertion, she responded that the online bank records and Citibank web-accessed statements could do so. One did not need Tyler's laptop for online web access to those accounts. The laptop only contained the QuickBooks application used for billing for Go Time Property Management.

### D. Dale Cubit's Trial Testimony

Cubit has spent his working life doing "dirt work" in construction. He has done almost 100% residential work for the past 10 years. He worked for Wright & Morrissey until around 2015-16 when he earned $25-27 per hour. He injured himself this past winter and has not worked since then in order to recuperate.

Cubit has known the parties to this case his whole life. He considers Shane his brother. Cubit has known the Fisks for as long as he can remember. He went to school with Shane. They spent every day together. The same goes for Lavanway. The three of them were constantly together.

The Fisks used to be close to LaRock and Fred as well. They all spent a lot of time together. Cubit had dug a pond for the Fisks on their property. He had also helped Lavanway build a house along with Shane and Cathy.

At some point in time, Cubit learned that LaRock would be moving to River Road. Shane asked Cubit to help Tyler with the dirt work. Cubit did not know that Shane co-owned the property until he saw Shane's and Cathy's names on the septic plan.

Initially, Cubit recalled the conversation involved a 50' by 50' shop with an apartment on top for LaRock with her paying for it and living there. Those plans changed at some point and the garage/apartment was never built.

Instead, LaRock built a tiny house. Cubit graded the driveway, built the pad for the concrete slab for the house and installed the septic tank. He graded the leach field and excavated for the pump tank. Basically, Cubit prepared the entire site for LaRock's tiny house and infrastructure.

Cubit had not heard about any written agreement for LaRock's tiny house. He had understood from conversations that LaRock had to pay for it and could live there the rest of her life. No one ever talked about what might happen if Ravelin and Tyler broke up.

Shane told Cubit he would pay him for his work. Cubit did not know who would pay him. Shane just told him not to worry about getting paid. Cubit is closer to Shane than his own brother so he did not give money another thought. Likewise, Cubit would have done the work as a favor to LaRock as well, given their friendship.

11

Cubit did not track his time. He provided a very low estimate and provided a small bill. It did not reflect his actual time. He never invoiced Shane and would not make a claim against him. Nor would he do so against LaRock. They were both too good friends for that. He estimates he spent about 800 hours doing all the site prep for LaRock's tiny house.

Tyler had tried to do some site work for LaRock's tiny house as well. Cubit would have to clean it up.

At some point, Cubit helped Lavanway connect a water supply on a trailer to LaRock's tiny house. Tyler had shut off her water. Cubit had never thought it a good idea for LaRock's tiny house to connect into Tyler's water supply, even though they could not locate a spring for her. Lavanway could not tow the trailer so Cubit did. Cubit did it as a favor to Lavanway. The Fisks took it as Cubit taking LaRock's side. Shane would not return Cubit's calls. Cubit never had a chance to explain it to him. The Fisks have not talked to him since.

Cubit also has experience snow plowing. He used to work for Griffin & Griffin so he has plowed most of the streets in Montpelier. He knows typical snow plows measure 9'6" to 10'. He believes Tyler's plow measures 9' to 9'6" although he now has a v-plow. With stakes 9' to 9'6" apart, Cubit knows one could not plow with even a 7' or 8' plow without pushing the stakes over.

### E. Kevin Lavanway's Trial Testimony

Lavanway has built houses since he was 15 years old. He has built 10 houses mostly by himself. His father was both a plumber and electrician. He trained Lavanway for five years.

Lavanway considered Shane his best friend for 52 years. Lavanway has known Cathy since Shane married her. Lavanway has known Tyler since birth.

Lavanway met LaRock in 2001 when she began dating Fred, another long-time good friend of Lavanway's. When Fred and LaRock started looking for a place to live together, Lavanway rented them a house.

Lavanway spent a lot of time together with LaRock and the Fisks. LaRock and Cathy also socialized. The group would hunt together and celebrate July 4th as a group. After Fred died, LaRock still remained part of that social circle.

At some point, Tyler approached LaRock about drawing up a garage with an upstairs apartment. The intended garage measured either 40' by 50' or 50' by 50'. LaRock would pay for the apartment construction. Lavanway understood that LaRock could then live there for the rest of her life.

No one built that garage. Lavanway thought the idea crazy for a couple of reasons. First, LaRock was already in her 60's and would have to walk up and down stairs as she aged. That did not make sense to Lavanway. Second, the size of the garage meant it would stand 16' tall. Putting an apartment on top would make the building even taller. It would require fire-proofing

12

the garage with double sheet rock and a sprinkler system. Fumes from the garage would remain a challenge. The idea did not make sense to Lavanway.

LaRock then called Lavanway about a house kit she was then considering buying. She asked him a bunch of questions. He said he really could not answer the questions without seeing the building. He offered to visit the shop with her. They did so.

He recalled the kit cost somewhere around $28,000, completely unassembled. Beyond assembly, the kit house needed more work to make it livable for four seasons. The kit only included framing, one door, two windows and tin. It contained nothing for the interior, no foundation, no septic and no plumbing or electricity. Lavanway ultimately concluded he could build a better house for less money.

Lavanway told LaRock she had to help build her house. She agreed and was on site every day she could be. She was absent only when she had to care for her dying mother. Lavanway understood he would get paid. He was not going to charge LaRock like a regular customer. At the outset, he did not know what he would charge her. They had no agreement, in writing or otherwise. Lavanway did it to help LaRock out.

Lavanway told LaRock that she should get something in writing with the Fisks. He remembers having this conversation with her when framing the house. She never did.

Lavanway did not know that Shane and Cathy co-owned the River Road property. He recalls talking with Tyler that LaRock would live in the house the rest of her life. No one thought about Ravelin and Tyler possibly breaking up.

LaRock designed her house. It was not designed to be movable. No one, including the Fisks, ever said it needed to be movable. LaRock has moved buildings before. He does not believe it would prove financially feasible to move LaRock's tiny house. It sits on a slab. To move it would require first cutting the anchor bolts then shedding the exterior boards. The house stands 16' tall on its own. A trailer would make it taller. Utility lines typically limit over-the-road clearance to 13'6".

Moving a house typically has further consequences. Removing it from its slab will destroy the flooring. Interior walls will require bracing which means cutting sheet rock to expose framing. The electrical supply line would require disconnection. Moving would also require removal of the sink and toilet and bracing the staircase.

Lavanway does not think one could move LaRock's house because of the spray foam insulation. It would require removing all sheet rock, rendering it unsalvageable. Lavanway estimates it would take a week and two dumpsters to remove the insulation. That removal would render about one-quarter of the lumber also unsalvageable, along with half of the electric, based on his experience. Bottom line, Lavanway would not have built LaRock's house if someone had told him it would require moving before he built it.

13

Lavanway also knows from his experience that LaRock's house cannot be sold because it does not have its own lot. It does not comply with the rental code because it was not intended to be rented.

Lavanway estimates he worked about one year to build LaRock's house. He works seven days a week typically. Except for installing the furnace, Lavanway worked on nearly every other aspect of the house. Lavanway's work included: milling most of the lumber, straight-line edging and planning the lumber, hauling and stacking the lumber, laying PEX for radiant-floor heating, pouring the concrete slab, installing rafters, roof, tin, outside boards, windows, doors, electrical, plumbing, spraying insulation, sheet-rocking, tongue and bead ceiling, painting, priming, installing loft railing, quick-click flooring, finish carpentry for baseboard and casings, installing cabinets, shower, toilet and vanity. Altogether, Lavanway estimates he would have charged $50,000 for his labor for a typical customer. LaRock paid him $5,000 and he billed her for $3,000 more for some materials. He had considered asking her for $10,000 more but he has not yet done so, depending on the outcome of this case.

In terms of site preparation work, Cubit did most of it. At one point, Cubit had all the site work completed. Tyler had moved some clay from another part of his property toward the bank near LaRock's house. Cubit came back the next day and saw that Tyler had destroyed what Cubit had done. Cubit regraded. A couple of days later, the same thing happened again. Cubit basically quit the job at that point.

Lavanway had seen Tyler doing site preparation incorrectly on the septic system. Lavanway recalled a day when he was working inside the house. He looked outside and saw Tyler putting a 1.5-foot grade where the septic mound required a level grade. Lavanway went outside to tell Tyler who then fixed it.

Tyler did not help build any of the house.

Lavanway had the idea to connect LaRock's house to Tyler's well to help get LaRock moved in before winter. He and Shane worked on that water connection together. Lavanway never said one way or the other whether that arrangement would be temporary or permanent. They just put it in.

After LaRock moved into the house, Tyler disconnected LaRock from his well. Lavanway helped LaRock connect a temporary, external water supply built on a trailer. He had Cubit help him tow it. Later that same day, Lavanway had to return to reconnect the system. Tyler had disconnected it after calling Lavanway to give him grief about installing it. Initially, Lavanway could not reconnect the system because of a broken valve. He repaired it and reconnected the system the following day.

During LaRock's final winter in the house, Lavanway saw that the driveway cable prevented LaRock's driveway from being plowed. He knew she worked at the grocery store. She would leave the cable down in the morning and tell Lavanway. He often drove by her house later in the day to see the cable reattached and her driveway unplowed.

14

### F.  Tyler Fisk's Trial Testimony

Tyler lives at 3105 River Road.  He owns the property with his parents.  He owns and operates Go Time Property Management LLC.  He mows, plows and does landscape, driveway and excavation work.

He obtained the building permit for LaRock's house.  Ex. S.  That permit requires a separate well.  LaRock never drilled one because of the expense.  No one had LaRock's septic system certified.  No one ever amended the permit.  Tyler has no background in building or wastewater permitting.

LaRock has no written agreement with Tyler or his parents for property rights.  They also have no arrangement for her to live in the house for life.  He never promised that.  Tyler never got Shane's or Cathy's permission for LaRock to live there for life.  Rent never came up but Tyler believes $1,000 per month would be a reasonable rent.

Ravelin previously threatened that she would make Tyler's life a living hell if he did not subdivide the property for LaRock.  Ravelin has done so.  He just never considered what might happen with LaRock's living situation if he and Ravelin broke up.

When Tyler first told Shane about the idea of building a place on their property for LaRock to live, Shane had concerns.  Shane knew Tyler and Ravelin had had rough patches.  Shane brought up getting something in writing with LaRock.  Tyler expected a written agreement from LaRock at some point, but he never received one.

Tyler agrees he let LaRock build on his property.  He did not invite her to do so.  He knew LaRock was dealing with her mother's failing health at the time.

Tyler helped with site preparation for LaRock's house.  He moved soil and topsoil to the front of the house, seeded the lawn and ditched and regraded the driveway because LaRock was not happy with part of it.  Tyler heard Cubit's testimony criticizing Tyler's work.  Tyler knows Cubit hates Tyler.

The suggestion to connect the water supply for Tyler's house to LaRock's came from Lavanway originally.  Tyler always understood that arrangement was temporary in order for LaRock to move into the house before winter came.  Tyler had concerns because his well does not produce much water.  He already installed a $2,500 system to soften his water.  He uses a lot of water to wash his vehicles and equipment.  He never told LaRock about any of those water problems before she built her house.  After she moved into her house, he did threaten to turn off her water at different times.

Tyler's breakup with Ravelin turned bad quickly.  Tyler tried to enlist LaRock's help in getting Ravelin to return Tyler's business computer.  LaRock said she could not influence Ravelin.  Tyler did not believe LaRock because of the close relationship she has with Ravelin.

15

Tyler thought Ravelin had stolen money from him or his business. He believes Go Time Property Management paid for the fuel in their on-site tank but Ravelin funneled payments through her hauling business. The state brought charges against Ravelin related to those allegations. The state has since dismissed those charges. As previously noted, the court finds Ravelin's testimony regarding the fuel tank payments and finances for Go Time Property Management more credible than Tyler's on these points. The court does not credit Tyler's testimony on these subjects.

Tyler has always enjoyed using all of his property, including the land near LaRock's house. He works in the field, driving his tractor, ATV or snow mobile. The land has a pond as well. Since this case began, he can no longer use the front yard without LaRock's friends videorecording him. He cannot retrieve his dogs when they go down the driveway without someone recording him.

Tyler acknowledges placing personal property around LaRock's house. That area has flat ground. He stored some of Ravelin's oil cans and tires there. Tyler acknowledges he could have stored those materials on other parts of his property. He admits frustration partly motivated him to put those items near LaRock's house.

The court does not find credible Tyler's initial explanation for storing materials by LaRock's house. The aerial photos of the property show its size. The property sits on a hill, so only some of the property provides level ground for storage. Level ground exists in other areas away from LaRock's house. In addition, Tyler placed the items immediately adjacent to her house, although not touching. The court infers Tyler's motives for doing so aligned with his testimony—he wanted LaRock's help in influencing Ravelin's behavior, especially the return of his work laptop. Tyler himself described the breakup as going bad quickly. The court concludes that Tyler's emotions got the better of him and he placed these items where he did, knowing the impact it would have on LaRock.

Tyler does not see any benefit from LaRock's house on his property. He has no use for it. The windows leak. Ex. J at 3. The house does not comply with fire code. He cannot rent it. He cannot use it as a garage. If he had his choice, he would tear it down. He would still have to deal with the slab, septic system and underground electrical.

Tyler has concerns about the house's spray foam insulation. He once lived in an apartment with that insulation. It required a 24/7 air exchanger to run to avoid moisture and a moldy air smell. LaRock's house does not have an air exchanger.

Tyler has not been inside LaRock's house since during construction. LaRock has it locked. He has no key.

Tyler concedes LaRock owns the house. In a July 2025 email to the electric utility, Tyler wrote, "I own the property just not the building . . . ." Ex. 24.

Since LaRock built her house on the Fisks's land, the Fisks can no longer obtain property insurance since they do not control access to the structure.

The overall situation has become nearly unlivable for Tyler.  He would sell his house now too if he could.  He once thought it was the perfect property for him with its privacy and its location nearby his parents.  Since his breakup with Ravelin, he has suffered nonstop harassment for three years.  Lavanway and Cubit, LaRock's friends, record him daily.  Tyler's family does not feel safe at his house.  He thought he would always live in Vermont near his family but he no longer thinks he can do it.  This situation has ruined his life.

## G.  Shane Fisk's Trial Testimony

Shane resides in Duxbury and is a retired truck driver.  He first met LaRock when she began dating Fred.  After Fred died in 2013, Shane still saw LaRock from time to time.  They remained friendly since Shane had been very close to Fred.  Also, LaRock's daughter and Shane's son were dating.

Shane never thought Ravelin and Tyler's relationship would last.  He had heard about infidelity.  Lavanway told Shane that Lavanway's daughter had been a partner in one instance of Tyler's infidelity.

Shane co-owns the River Road property with Tyler and Cathy.  Shane and Cathy co-signed for Tyler.  Tyler lives on the property and communicates some things about it.  Tyler lives there day today and manages it.  Tyler has not made any significant decisions about the property without consulting Shane.

Shane first learned of the idea of LaRock building on the property from Tyler.  Shane was less than thrilled.  He did not think Tyler's relationship with Ravelin would last.  Shane never had any discussions with LaRock about the house.  He never signed any agreement with LaRock.  Before LaRock built her house, Shane had never heard that LaRock would live there the rest of her life.  Shane never made any promises to her.  He does not know of any explicit agreements for LaRock to use their property.  Shane would not have approved LaRock living there for life without conditions.

While LaRock built her house, Shane occasionally helped.  He was on site a couple of times per week.  Lavanway had the idea to connect her house to Tyler's well.  Shane did not like the idea.  Lavanway assured him the connection would be temporary, just to get LaRock into the house before winter.  LaRock never paid for the water.

At some point, Shane asked LaRock to remove her house from their property.  She has not.

At the outset of this dispute, Shane asked LaRock to leave.  She refused.

The house provides no benefit to Shane or his family.  LaRock designed the house for herself.  Shane has no use for it.  Shane had never discussed with Tyler or Cathy the idea of developing other buildings.  For LaRock's house, Shane and his family would need to invest

17

additional money to bring it into compliance with the permits. If it were up to him, Shane would tear down LaRock's house.

Shane does not have a construction background. He has concerns about LaRock's house. He has seen photos of the moisture in a window. Lavanway used reclaimed materials for part of the construction. Some of the sheet rock came as partial seconds from Sticks 'n Stuff. Lavanway installed the lumber while it remained green. Shane has known Lavanway over 50 years and has seen other houses he has built. As a result, Shane has concerns that LaRock's house may not last.

### H. Cathy Fisks's Trial Testimony

Cathy lives in Duxbury with her husband Shane. She used to work at the state office of child support and has retired.

Cathy first heard talk of LaRock building on their River Road property around May 2022. She heard it from LaRock, Lavanway and Tyler. No agreement existed. No one discussed that LaRock would live in the place for life or that it would go to Tyler and Ravelin after she died. Cathy would have expected to have a say in that arrangement as a part owner of the property. Tyler would have consulted her.

Cathy recalls two encounters in the autumn of 2023 with LaRock during the breakup of Tyler and Ravelin. The first time, Tyler came to Shane and Cathy's house to say they were breaking up. Tyler had concerns about his business and that he would have to give one acre of land each to Ravelin and LaRock. Cathy understood those were Ravelin's and LaRock's demands. Tyler said Ravelin had said she would make his life a living hell if he did not agree.

Cathy never intended to subdivide the land, regardless of what Ravelin and LaRock wanted.

Cathy then went to speak to LaRock. Cathy wanted to find out what was going on to try to find a resolution. She viewed it as two mothers talking about their kids. It was an emotional conversation. LaRock was crying and saying she had no one to talk to. Cathy responded that LaRock could speak with Lavanway since everyone trusted him at the time. Cathy told LaRock that the Fisks would not ask LaRock to leave the property. Cathy meant that they would not ask LaRock to leave the property at that time, although she did not explicitly say that.

The second interaction took place about one month later. At that time, Tyler was still trying to get Ravelin to return his business computer. Things between them had become more tense. Cathy had become more concerned about Tyler and the stress on him. He and Ravelin had still not worked out any arrangement. Cathy told LaRock that if "those two idiots" (meaning Ravelin and Tyler) cannot figure things out, then LaRock would "fucking need to get the fuck off our property." Cathy loves Tyler and the conversation with LaRock got emotional.

LaRock's house has increased the Fisks's property tax assessment at River Road. The tax burden has increased approximately $60,000 since LaRock built her house. Ex. G. The house remains unfinished. Cathy has no use for the building. She would tear it down if she could.

LaRock used to be Cathy's friend. LaRock's refusal to leave when asked does not sit well with Cathy. The situation has snowballed over the past three years. It has been bad for everyone.

## I. Additional Findings

This section contains additional findings to clarify how the court reconciled inconsistent or conflicting testimony on topics potentially relevant to the remaining claims.

### 1. Further Observations and Findings About Credibility and Bias

The court observed the parties over three days of trial. Those observations included watching the witnesses testify as well as observing them when they remained in court to observe. Their facial expressions and body language throughout the course of trial provided the court additional relevant insight as it makes its findings.

The circumstances surrounding this case have created divided allegiances which impact all witnesses' credibility. LaRock and her witnesses, Ravelin, Lavanway and Cubit sat on one side of the courtroom. The Fisks sat on the other. When the IT department forced trial to move from Montpelier to Barre, the parties switched sides due to the courtroom layout. Lavanway and Cubit followed LaRock to her new side of the courtroom. Ravelin sat in court only briefly before her sequestration and did not return after her testimony. For her brief time in the courtroom, she sat on LaRock's side. Lavanway's and Cubit's body language throughout trial— shaking heads and crossed arms—expressed dubiousness of the Fisks's litigation position generally.

During witness testimony criticizing the build quality of LaRock's house, Lavanway first became visibly agitated and then prudently excused himself from the courtroom on his own. When he returned, he remained well behaved. Seated next to Cubit, Lavanway's posture also inclined toward supporting LaRock.

Likewise, the Fisks sat throughout trial, whether testifying or not. Shane remained mostly impassive both on and off the witness stand. Cathy looked away and occasionally shook her head during testimony by LaRock and her witnesses. Cathy's demeanor revealed she took particularly personally perceived insults to Tyler. Cathy presented every bit as the protective mother who admittedly loved her son and stalwart wife with demonstrable steadfastness to her husband. While testifying, Cathy had much stronger intensity than either her husband or son. She easily recalled how she had to tell LaRock "fucking to get the fuck off" their property. As she testified, the emotional readiness of her vernacular recall evidenced the rawness of her emotions regarding the situation with LaRock.

19

Tyler's testimony revealed strong emotion regarding the difficulty of the past few years. Otherwise, he remained reserved. That contrast made clear to the court how painfully his breakup with Ravelin has impacted him. Yet he never voiced or otherwise expressed hard feelings toward Ravelin, even when he described how she has made good on her promise to make his life a living hell the past few years.

The collective family body language and tone of the Fisks throughout trial, both while testifying and otherwise, underscores for the court the credibility of their stated intention to remove LaRock's house if they had their druthers. Throughout trial and testimony, they evinced a consistent desire to erase this whole episode from their lives. Removing LaRock's house completes that.

LaRock presented as generally cagey. For example, when asked repeatedly about whether she paid property tax, insurance costs or utilities, she generally used language that no one asked her to do so, rather than simply acknowledging that she had not. Similarly, when asked repeatedly about the absence of a written agreement regarding her housing arrangement, she used language like no one ever presented an agreement to her, rather than simply acknowledging that no agreement existed. From these instances, the court inferred LaRock's strong reluctance to take accountability for her actions or inactions in the circumstances leading up to this litigation.

The court also found noteworthy one aspect of the testimony by both Ravelin and Tyler. When each testified about the other, the court noted an emotional softness to their tone. Similarly, neither witness said much if anything directly negative about the other. Even when Ravelin discussed Tyler's infidelity, she spoke more of her embarrassment than her anger about the situation. Tyler acknowledged how readily their breakup went bad. He evinced palpable anger over Ravelin taking his work laptop. However, he did not speak ill more generally of Ravelin. This behavior demonstrates to the court that the two still share a respect for the life they once had together, no matter how things have turned out.

The court records these observations because they reflect the foundational dynamic of this case. This litigation arises out of a difficult breakup between two people who lived together and cared about each other for a decade. In addition to them, their relationship wove together two extended families through mutual friends. The breakup of Ravelin and Tyler meant the breakup of the families. For the friends caught in between, Lavanway and Cubit, they either chose sides or sides chose them. Despite any one's and everyone's best efforts, these circumstances impact this case and the court's assessment of the witnesses' testimony.

### 2. LaRock's Living Arrangement

LaRock has abandoned and the court has dismissed her oral contract and promissory estoppel claims. The court does not need to address whether there existed any agreement between the parties about her living arrangement.

The pending cross claims for unjust enrichment make the parties' pre-construction expectations relevant. For that reason, the court finds the parties did not have any agreement

20

regarding LaRock's tenancy before she built her house. The testimony of LaRock and her witnesses make that clear. They all testified consistently regarding discussions or understandings about LaRock's tenancy. No one could identify any particular conversation where any of the Fisks said unambiguously words to the effect that LaRock had a life tenancy in the tiny house she planned to build.

LaRock testified that she had that conversation explicitly with Tyler but he denied it. She did not place any time or date on that conversation. Nor did she provide any other detail about that conversation for the court to infer that it reliably happened. The court does not credit it.

Instead, the testimony by LaRock and her witnesses reflected the wishful thinking all the parties described. Everyone knew from life experience generally and Ravelin and Tyler's relationship specifically that relationships do not always last forever. No one ever talked about or thought about what might happen if the two broke up. Some, like Lavanway and Shane, even counseled the parties to put something in writing. No one did. The court accepts that LaRock hoped she could live in her tine house forever, but the court finds no evidence to support that she had a reasonable expectation to do so under the circumstances.

Likewise, the evidence shows without contradiction that the Fisks either helped or watched as LaRock built a slab house on their property. They assisted or acquiesced in LaRock having a reasonable expectation of a tenancy for a significant duration. Both Tyler and Shane helped in some part of the construction. Cathy visited the work site of the house during construction. The court finds that the parties all shared an expectation that LaRock would live in the house for a period of time.

The court also finds that understanding came with additional points of agreement. LaRock had to pay all the construction costs of her tiny house. She also had to pay for any incremental costs to the Fisks's property—increases in utilities, including water, property tax and property insurance and property maintenance. LaRock acquired no property interest outside her house, but her house had a dedicated driveway which benefited her so those costs reasonably fell to her exclusively.

By the account of LaRock, Ravelin and Tyler, the court finds also that LaRock always expected that her house would become Ravelin's and Tyler's at some point in time. Ravelin has abandoned any interest she had to her one-half interest as she has moved off the property. She has not brought a third-party claim in this case against Tyler. The court finds Tyler has acceded to her interest. Tyler's ownership of the house through this case has meant his ownership has happened earlier than expected (before her death), but LaRock always expected it (after her death).

The court makes further findings regarding LaRock's house in its current state. It has no independent water supply. The permit requires a separate well for it. It does not have one. The parties testified it would cost at least $20,000 to install a well for the house. It cannot be sold because it does not sit on its own land. In its current state, it cannot be rented because it does not comply with the rental code.

The court finds that a reasonable rate of rent for LaRock of her tiny house would be $1,000 per month, if it were legally rentable. In its current state, it has a rental value of $0 because it does not comply with the rental code. Lavanway, LaRock and Tyler testified as much. LaRock testified that she had recently searched for rental properties in the area. She based her estimate on that experience. Because the property is not rentable in its current state due to its failure to comply with the rental code, the court emphasizes that this rental rate would apply only to LaRock's rental of the house if she were to have to pay the Fisks rent for her period of occupancy.

The court finds the value of LaRock's house to be approximately $62,950. That figure represents LaRock's claimed building expenses, Ex. 10, slightly more than the $62,800 increase in the property tax assessment of the Fisks's property after LaRock built her house. Ex. G. LaRock provided no appraisal of the house, even though she testified that she had an appointment with an appraiser. She provided no factual basis for her bare opinion that her house was worth $150,000. She has no background in property appraisal and testified to no personal experience looking at housing prices in the area. These factors bear on the weight the court affords LaRock's opinion, not its admissibility. *See* 12 V.S.A. § 1604.

The court does not credit LaRock for her "sweat equity." She has not demonstrated what if anything she forewent in building her house. For instance, if she lost wages at the grocery store where she works by spending time building her house. She concedes she never paid the Fisks for any of the utility or property insurance costs she had offered. Nor did she pay any rent. She has not proven that her "sweat equity" calculation nets any alleged amounts she might otherwise owe the Fisks.

LaRock has not incurred additional damages. The bills that Ravelin, Lavanway or Cubit could send her do not constitute damages because she has not incurred any of those costs or shown a likelihood of incurring those costs. Ravelin, Lavanway and Cubit have not brought third-party claims in this case. Only Lavanway testified that he has not ruled out sending her an invoice, but he did not indicate that he had a likelihood of doing so.

Tyler and Shane have not put forth evidence to quantity their damages for assisting in the construction of LaRock's house.

The court finds the Fisks withdrew any invitation for LaRock to remain on their River Road property as of October 31, 2023. LaRock and Cathy both testified to the unambiguous language Cathy used in telling LaRock to get the "fuck off their property" at that time. LaRock acknowledged, as Shane testified, that the Fisks also asked LaRock to remove her house. The parties' October 2024 agreement does not change this finding because it preserved the parties' litigation positions. Ex. R. Consistent with that agreement, the Fisks have a counterclaim for trespass.

22

### 3. Quality of Construction

The parties provided differing testimony regarding the quality of the construction of LaRock's house. In particular, Tyler and Shane noted the moisture in one window, the use of reclaimed material and green lumber. Neither of them have construction experience.

Lavanway and LaRock have the most construction experience of the witnesses. Lavanway has the most extensive experience and testified that he has built at least 10 houses. Cubit confirmed Lavanway often uses reclaimed materials. Cathy testified that, before things unwound, everyone trusted Lavanway. The court found Lavanway's testimony and knowledge regarding residential construction and code compliance credible.

The court finds that the quality of construction of LaRock's house is reasonable for its purpose. The court finds that it would last for its intended lifespan of some significant tenancy of years as would reasonably be expected for a slab-built wooden tiny house in Vermont. The court credits Lavanway's opinion that the moisture in one of LaRock's windows reflects a broken seal on a multi-paned window. It does not reflect any defect of workmanship.

On the topic of construction, the court finds Lavanway as the most credible and experienced witness.

## II.     Discussion

### A. Unjust Enrichment

Under the doctrine of unjust enrichment, "a party who receives a benefit must return [it] if retention would be inequitable." Unjust enrichment is present if, "'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." Whether there is unjust enrichment present "'may not be determined from a limited inquiry confined to an isolated transaction. It must be a realistic determination based on a broad view of the human setting involved.'"

*Mueller v. Mueller*, 2012 VT 59, ¶¶ 28–29, 192 Vt. 85, 96–97 (citations omitted). The Vermont Supreme Court has "not yet ruled on the validity of a claim of unjust enrichment for unrequested benefits—that is, unrequested benefits voluntarily conferred upon the recipient by the claimant." *Birchwood Land Co. v. Krizan*, 2015 VT 37, ¶ 8, 198 Vt. 420, 425.

The Restatement and other jurisdictions provide additional guidance.

If the claimant makes expenditures to maintain, improve, or add value to property that the claimant reasonably expects to retain or to acquire, and (because such expectation is frustrated) another person becomes the unintended beneficiary of the claimant's expenditure, the claimant is entitled to restitution from the other as necessary to prevent unjust enrichment.

23

Restatement (Third) of Restitution and Unjust Enrichment § 27 (2011).

"Measure of recovery becomes a visible issue in cases under this section when—as is often the case with improvements to real property—the cost to the claimant of conferring the benefit in question differs appreciably from any measurable addition to the defendant's wealth." *Id.* cmt. c. "Benefit is sometimes equated with cost, where benefit is difficult to measure directly and cost makes a reasonable proxy." *Id.* "The measure of enrichment may reflect the court's assignment of blame for the fact that the underlying transaction has miscarried. The enrichment of defendant who bears such responsibility will be measured in a way that protects the claimant against loss." *Id.*

"A claimant within the rule of this section may have improved or contributed to another's property in reliance on the other's representations—explicit or tacit—that the property will at some future date be given to the claimant . . . ." *Id.* cmt. e. To illustrate,

> 11. Father and Mother, holding Blackacre as joint tenants, encourage Son and Daughter-in-Law to build a house on one corner of the property. Son and Daughter-in-Law spend $100,000 on improvements, residing on the property until their marriage is dissolved five years later. In subsequent litigation, Daughter-in-Law asserts that Father and Mother repeatedly promised that the improved tract would be given to her and her husband, or left to them by will. Father, Mother, and Son all deny that any such promise was made. *Whether or not there was a promise, it is established that the improvements were made with the acquiescence of Father and Mother, in the reasonable expectation by Son and Daughter-in-Law that they would eventually become the owners of the improved tract.* The improvements—to which Son and Daughter-in-Law contributed equally— increase the value of Blackacre by at least $100,000. Daughter-in-Law has a claim against Father and Mother under this section to recover $50,000, secured by an equitable lien on Blackacre.

*Id.* illus. 11 (emphasis added). Cases from Illinois, Maine and Rhode Island have followed this approach. *Id.* Rptr's n. e (citing cases). *See also In re Hoskins*, 405 B.R. 576 (N.D.W.Va. 2009) (finding restitution for visitor who had license to build cabin on property until tortiously evicted).

An important exception exists.

> g. *Reasonable expectation.* There is no claim to restitution by the rule of this section unless the claimant reasonably expected to retain or acquire the ownership interest benefited by the claimant's expenditure. The mere fact that a different outcome might have been foreseen is not enough to defeat the restitution claim, since as much might be said in most (if not all) of the cases in which recovery is allowed. *But where the risk of intervening contingencies is not only logically conceivable but reasonably apparent—with the result that the asserted liability in restitution might properly have been the subject of a contract between the parties—restitution will be denied.* One way to explain this result is to

24

observe that the claimant assumed the risk that the expenditures in question would benefit someone else.

*Id.* cmt. g (emphasis added). While the court "frequently ha[s] adopted provisions of this Restatement where [Vermont] law is undeveloped," *Birchwood Land Co. v. Krizan*, 2015 VT 37, ¶ 9, 198 Vt. 420, 425, the court has not yet adopted § 27. *Beldock v VWSD, LLC*, 2023 VT 35, ¶ 74, 218 Vt. 144, 179.

The related decisions by the Vermont Supreme Court under § 30 of the Restatement suggest that a party claiming unjust enrichment for unrequested benefits cannot recover without meeting their burden to prove an actual benefit conferred on the beneficiary. *See, e.g.*, *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22, 194 Vt. 446 (holding plaintiff could recover from defendant for period defendant received benefit); *Lasek v. Vermont Vapor, Inc.*, 2014 VT 33, ¶ 18, 196 Vt. 243 ("plaintiff's claim fails because he did not show that landlord received a benefit from his improvements"). "Restatement § 30 embraces the principle that incidental benefits—benefits conferred on the recipient by work that the claimant undertook for its own benefit—rarely are recoverable in restitution unless the benefits are a consequence of mistake, fraud, or compulsion." *Birchwood Land Co.*, 2015 VT 37, ¶ 14. "There must be some injustice in allowing [the alleged beneficiary] to keep the [alleged benefits]. The fact that the defendants made use of the improvements does not make their retention of the benefits unjust." *Id.* ¶ 12 (quoting *Ranquist v. Donahue*, 710 F. Supp. 1160, 1162 (N.D. Ill. 1989) (internal quotations omitted). Reasoning that "Section 30 precisely fits the facts of this case, and the precedent on which it relies . . . is indistinguishable in substance," *id.* ¶ 15, *Birchwood* adopted § 30 as "the governing law for this case" and found the "unjust enrichment claim fails under § 30." *Id.* ¶ 16.

This court has followed the approach of *Birchwood Land Co.* to assess the applicability of § 27 to this case. This court concludes that § 27, including its comment g, "precisely fits the facts of this case and the precedent on which it relies . . . is indistinguishable in substance." *Birchwood Land Co.*, 2015 VT 37, ¶ 16.

This court has reviewed the cases on which § 27 based its illustration 11. *See* Restatement (Third) of Restitution § 27 Rptr's n. e. They applied § 27 consistently, where an injustice existed. *E.g.*, *Dellagrotta v. Dellagrotta*, 873 A.2d 101, 113-15 (R.I. 2005) (upholding unjust enrichment award for former daughter-in-law for improvements she made to house owned by former husband's parents under expectation that the house would belong to her and her husband before they divorced); *Siciliani v. Connolly*, 651 A.2d 386, 387 (Me. 1994) (affirming unjust enrichment award to former daughter-in-law who built house on property owned by former mother-in-law on expectation that latter would convey land to son, plaintiff's ex-husband); *Pope v. Speiser*, 7 Ill.2d 231, 237-39 (Ill. 1955) (imposing equitable lien on former father-in-law's land on which former son-in-law and daughter, when married, made improvements based on the implied promise that father-in-law would deed land to daughter); *Robinson v. Robinson*, 100 Ill. App.3d 437, 446-48 (1981) (finding parents broke implied promise to son and former daughter-in-law to deed land on which latter couple built house, justifying equitable lien imposed on parents' land in favor of former daughter-in-law). In all of these cases, the courts concluded that the prevailing plaintiff deserved restitution because of the

25

unjustness of the changed circumstances that deprived the claimant of the improvements they expected to retain as a result of defendants' actions.

LaRock cannot make the same claim to the same extent in this case. The testimony of LaRock and her witnesses consistently show that they always understood the tiny house would become Tyler's.[4] The court finds nothing unjust about Tyler getting LaRock's house.

Any potential unjustness comes from the timing of Tyler's ownership of LaRock's house. In her mind, LaRock has lost her life tenancy. As the court found, the Fisks actively helped (Tyler and Shane) or passively allowed (Cathy) LaRock to build her slab house on their land. They have since acted inconsistently. These circumstances might suggest unjustness supporting LaRock's claim.

The reasonable expectation exception in § 27's comment g addresses this situation. Restatement (Third) of Restitution and Unjust Enrichment § 27 cmt. g (2011) ("But where the risk of intervening contingencies is not only logically conceivable but reasonably apparent—with the result that the asserted liability in restitution might properly have been the subject of a contract between the parties—restitution will be denied."). The underlying cases analogously support this exception. *E.g.*, *Mullins v. Mullins*, 797 S.W.2d 491, 492-93 (Ky. 1990) (denying unjust enrichment because successful claimant must "actually believe[], and ha[ve] no reason to believe to the contrary, that his title is good" to the property on which they make improvements).

The court finds most persuasive and analogous the Wyoming Supreme Court decision that the Restatement notes as an outlier. Restatement (Third) of Restitution § 27 Rptr's n. e (describing it as a "surprising case"). In *Jacoby v. Jacoby*, 100 P.3d 852 (Wy. 2004), the court reversed an equitable lien on land owned by appellants in favor of appellee, their former daughter-in-law. The parents let their son and his wife build a house on the parents' land, intending it to be the family home of the son, his wife and their children. *Id.* at 853-54. All parties contributed to the house's construction but the son left his wife and children before its completion. *Id.* at 854. The parents completed it and moved into it themselves. *Id.*

The court noted the reality of the circumstances. "It is doubtful that a contract existed, given the dearth of agreement, or even discussion, of many significant terms." *Id.* at 855. Parents held title and the son and his wife had intended to make payments on the loan for the house. *Id.* "The most that can be said is that this was an informal family arrangement that failed because the appellee and her husband divorced, resulting in an inability to finish the project or make the payments as expected." *Id.* The *Jacoby* court found appellee had not satisfied Wyoming's requirements for an unjust enrichment claim because

> There[wa]s no evidence that, as part of the poorly crafted inter-family
> arrangement, the appellee expected the appellants to pay her for her services or
> for any materials she may have furnished. She merely expected to remain married

---

[4] This court has already found that Ravelin has abandoned any claim she might have to it. Because LaRock never knew Shane and Cathy part-owned the River Road property until after she built her house, she had no expectation that Shane and Cathy would some day own it.

26

to her husband and to move into the house with him.  The fact that such did not occur did not create an obligation on the part of the appellants to pay her.

*Id.* at 856.  "The divorce caused the appellee and her husband to lose their investment in the house.  That loss, although perhaps not 'fair,' was not the appellants' fault and should not be their responsibility."  *Id.* at 857.

This court concludes that § 27's comment g and *Jacoby* prevent LaRock from recovering in unjust enrichment.  As comment g and the evidence in this make clear, LaRock could have avoided any losses with an agreement.  She failed to make one and offered no reasonable explanation for failing to do so.  As in *Jacoby*, LaRock's loss of any tenancy in her tiny house did not fail because of anything Shane and Cathy did.  Tyler has his share of accountability for the dissolution of his relationship with Ravelin.  Nothing in the trial evidence suggests he ended his relationship with Ravelin in order to benefit from LaRock's house construction.  On the contrary, the trial testimony indicates that, at the time of his breakup from Ravelin, Tyler expected to have to deed land to Ravelin and LaRock.  No evidence suggests unjust enrichment from LaRock's house construction motivated him to break up with Ravelin.

The Fisks likewise cannot recover under comment g.  Like LaRock, they also failed to reach any agreement with LaRock regarding her house construction or living arrangements.  They also offered no reasonable explanation for their failure to do so.  The trial evidence points to no responsibility by LaRock for the breakup of Ravelin and Tyler.  Nothing LaRock did can support her becoming enriched unjustly by the dissolution of that relationship.  The Fisks cannot reasonably expect rent from LaRock, where no evidence suggests they ever contemplated LaRock paying rent.  While the Fisks might have a grievance for the unpaid property taxes, property insurance and utility costs, their unexplained failure to execute an agreement with LaRock for those expenses prevents their claiming unjust enrichment now.

Even if this court has made a legal mistake in reaching this conclusion, the court finds that no party has met their burden to prove damages resulting from any unjust enrichment claim.  LaRock offered no evidence by which the court could quantify her life estate in the tiny house.  She testified that she graduated high school in 1975 so the court could estimate her age.  She offered no evidence regarding her health or life expectancy.  Even if she had, the court might need additional information to estimate how much of her life she could spend in a two-story tiny house with a bedroom loft on a hill, given the typical challenges of mobility that come with more advanced age.  LaRock testified she planned to move her bed to the first-floor if age prevented her from accessing the loft.  The hilltop site would remain.  She offered no reasonable basis for the court to calculate any of these timeframes.  Given the record evidence, the court would have to speculate even to estimate this calculation.

The Fisks have not met their burden on damages regarding their unjust enrichment counterclaim.  The evidence does not allow the court to estimate reasonably the costs of bringing the tiny house into compliance with its existing permit conditions or the costs of amending its permit.  The court has only the dated $20,000 estimate to drill a well.  The Fisks have similarly offered no evidence by which the court could estimate the cost of bringing the tiny house into compliance with the rental code or what the rental code may require.  The trial evidence has

established only that the tiny house does not comply with those requirements to be rented lawfully.

There also exists insufficient trial evidence regarding the cost of the property tax situation at the River Road property. The evidence shows that the premium increased, but not the premium period. Ex. 4 at 4. The evidence that the Fisks can no longer insure their property because LaRock controls access to the tiny house exists only as a statement not subject to quantification.

The court concludes that all parties' claims and counterclaims for unjust enrichment fail.

**B. Trespass**

For their counterclaim 1 for trespass, the Fisks must prove that LaRock "intentionally entered land in [their] possession without privilege to do so." *Billewicz v. Town of Fair Haven*, No. 21-AP-244, 2022 WL 424881, at *2 (Vt. Feb. 11, 2022).

"A trespasser is a person who enters or remains on land in the possession of another without the possessor's consent or other legal privilege." Restatement (Third) of Torts: Phys. & Emot. Harm § 50 (2012). Trespassers include people who holdover after the termination of a lease, license or privilege. Restatement (Fourth) of Property § 10.5 TD No 6 (2025), *id.* § 10.5 cmt. c; Restatement (First) of Torts § 158 cmt. k (1934). A landowner can terminate consent for a third party to remain on their land as long as the third party knows or has reason to know of the termination. *Id.* § 171 & cmt. d. "An unprivileged remaining on land in another's possession is a continuing trespass for the entire time during which the actor wrongfully remains." *Id.* § 158 cmt. l.

> A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land
> > (a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated, or
> > (b) pursuant to a privilege conferred on the actor irrespective of the possessor's consent, if the actor fails to remove it after the privilege has been terminated, by the accomplishment of its purpose or otherwise.

Restatement (Second) of Torts § 160 (1965). *See also Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 26 ("[A] landowner owes the same duty of care to a licensee as to an invitee.").

> Even though the actor or his transferor has not agreed to remove the structure, chattel, or other thing from the land upon the termination of the license pursuant to which it was placed there, as where the parties act under a mistaken belief that the license is irrevocable, the termination of the license creates a situation in which the rule stated in this Section applies.

Restatement (Second) of Torts § 160 cmt. g (1965). "The intentional violation of such a duty of removal constitutes a continuing trespass for the entire time during which the actor is under a duty to remove the thing . . . ." *Id.* cmt. e.

Based on the court's findings of fact, the court concludes LaRock became a trespasser on the Fisks's River Road Property on Oct. 31, 2023 when Cathy told LaRock "fucking to get the fuck off" the Fisks's property, or words to that effect. The court finds Cathy's statement, corroborated by LaRock, constitutes unequivocal termination of any prior consent the Fisks gave LaRock to access their property. As noted below, Tyler's subsequent activities (alleged by LaRock to constitute a nuisance) reflected the Fisks's continued withdrawal of their prior consent for LaRock to remain on their property. LaRock's remaining on the Fisks's property until she left in February 2025, as well as leaving the house on the property, constitute a continuing trespass against the Fisks.[5]

## C. Private Nuisance

"'The law of private nuisance springs from the general principle that it is the duty of every person to make a reasonable use of his own property so as to occasion no unnecessary damage or annoyance to his neighbor.'" *Myrick v. Peck Elec. Co.*, 2017 VT 4, ¶ 4, 204 Vt. 128, 131 (citations omitted). "[P]laintiffs claiming a nuisance have to demonstrate actual and substantial injury." *John Larkin, Inc. v. Marceau*, 2008 VT 61, ¶ 10, 184 Vt. 207, 211. "To sustain such a claim, a party must show that 'an individual's interference with the use and enjoyment of another's property [is] both unreasonable and substantial.'" *Paris v. Lussier*, No. 2010-034, 2010 WL 7791942, at *4 (Vt. July 16, 2010) (unpub. mem.) (citation omitted).

> For a private nuisance there is liability only to those who have property rights and privileges in respect to the use and enjoyment of the land affected, including
> (a) possessors of the land,
> (b) owners of easements and profits in the land, and
> (c) owners of nonpossessory estates in the land that are detrimentally affected by interferences with its use and enjoyment.

Restatement (Second) of Torts § 821E (1979). "One having 'property rights and privileges' in land can maintain an action under the rule here stated, only if the conduct of the actor interferes with the exercise of the particular rights and privileges that he owns." *Id.* cmt. a.

This court has not found a Vermont decision addressing whether a trespasser may bring a nuisance claim. "According to a majority of authorities, only possessors, owners, or occupiers of land may be impaired in their use and enjoyment of land and, therefore, recover for a nuisance."

---

[5] LaRock has not claimed that building her tiny house on the Fisks's land under the circumstances of this case resulted in an irrevocable privilege. *E.g.*, Restatement (Second) of Torts § 160 cmt. j (1965) ("The question whether a license to erect a structure or cast a chattel or other thing on land in another's possession when acted on or when coupled with a legal interest creates an irrevocable privilege to maintain it there is not within the scope of the Restatement of this Subject.").

*Stevensen v. Goodson*, 924 P.2d 339, 348 (Utah 1996) (citing majority rule under laws of Illinois, New York, Indiana, Kansas, Mississippi, Virginia, West Virginia, Kentucky and treatises and minority rule in Colorado). *See also Metro. Gov't of Nashville & Davidson Cnty. v. Counts*, 541 S.W.2d 133, 138 (Tenn. 1976) ("[W]e have concluded that nuisance cannot be the basis of liability to a trespasser."); *Meizoso v. Bajoros*, 12 Conn. App. 516, 518, 531 A.2d 943, 944 (Conn. App. Ct. 1987) ("[I]n order to recover in a private nuisance action a plaintiff must have an ownership interest in the land.") (citations omitted); *Cosme v. Bank of Am., N.A.*, No. TTDCV146007738S, 2014 WL 5472123, at *3 (Conn. Super. Ct. Sept. 30, 2014) ("[A] transitory guest, licensee, or trespasser cannot advance a claim of damages based on nuisance.").

This court finds the Restatement and majority approach persuasive. *Cf. Treadway v. Green Mt. Pwr. Corp.*, 2026 VT 20, ¶ 15 ("[T]his Court has . . . reaffirmed the lack of a duty to trespassers in multiple cases."). LaRock may not maintain a nuisance action against the Fisks in this case. All of the activities allegedly supporting her claim took place after October 31, 2023 while she trespassed on the Fisks's land. The activities by Tyler that LaRock alleges formed the basis of her private nuisance claim instead reflected the Fisks's ongoing communication of their sustained withdrawal of consent for LaRock to remain on their property beginning Oct. 31, 2023. Restatement (First) of Torts § 171 & cmt. d (1934).[6]

### D. Damages

With the resolution of the parties' claims for unjust enrichment and nuisance, the court focuses on measuring damages for the Fisks's trespass claim against LaRock. The law and facts both challenge that undertaking in this case.

The Restatement provides two approaches that could apply to this case.

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>> (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,
>> (b) the loss of use of the land, and
>> (c) discomfort and annoyance to him as an occupant.

Restatement (Second) of Torts § 929 (1979).

> (1) If one causes continuing or recurrent tortious invasions on the land of another by the maintenance of a structure or acts or operations not on the land of the other and it appears that the invasions will continue indefinitely, the other may at his election recover damages for the future invasions in the same action as that for the past invasions.

---

[6] This court does not reach whether the actions by Tyler may support a nuisance claim as a matter of law.

. . . .

     (3) The damages for past and prospective invasions of land include compensation for
          (a) the harm caused by invasions prior to the time when the injurious situation became complete and comparatively enduring, and
          (b) either the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring, or the reasonable cost to the plaintiff of avoiding future invasions. . . .

Restatement (Second) of Torts § 930 (1979).

     When the private structure or enterprise that is producing the invasions is substantial and relatively enduring in character and not readily alterable so as to avoid future injury, its maintenance or operation ordinarily indicates that the owner intends to continue indefinitely to cause invasions upon the neighboring land. "Indefinitely," as used in this Section does not mean that the situation may be expected to last forever, but merely that there is no reason to expect its termination at any definite time in the future. . . .

Restatement (Second) of Torts § 930 cmt. b (1979).

     The record evidence in this case makes it difficult to apply either Restatement section. No party offered a property appraisal for LaRock's tiny house or for the Fisks's property. The best evidence comes from the coincidentally comparable figures of about $63,000 from LaRock's costs to build the structure, Ex. 10, and the increased property tax burden to the Fisks, Ex. G. That figure provides part of the approximation of "the difference between the value of the land before the harm and the value after the harm" under § 929 or of "harm caused by invasions prior to the time when the injurious situation became complete and comparatively enduring" under § 930.

     That figure remains incomplete. It does not reflect that the Fisks have lost the ability to insure their property because of the tiny house, that their property does not comply with the building permit because the tiny house has no separate well, that they may not lawfully rent the tiny house because it does not comply with the rental code and that their property tax burden has increased without any offsetting economic benefit. Permit or rental code compliance would require additional costs, although no evidence enables the court reasonably to quantify those costs. None of these considerations reflects the Fisks's actual desire to tear down the tiny house. Nor does any evidence exist by which the court could reasonably estimate the costs of demolition.

     No evidence meaningfully helps the court measure "the loss of use of the land" or "discomfort and annoyance" to the Fisks resulting from LaRock's house. Restatement (Second) of Torts § 929(b), (c) (1979). The court can infer the "loss of use of the land" is minimal, based on the trial evidence. Aerial photos of the property show the tiny house's correspondingly tiny

footprint on the Fisks's land.  The court already discredited Tyler's testimony that it occupied usable flat land for storage space, as the photos and his testimony showed other flat areas for storage abound on the property.  The court already found the tiny house unrentable under the rental code.  Damages cannot include lost rents.  Similarly, LaRock's house occupied the area that Tyler had staked, where nothing had previously stood.  No trial evidence indicated that the Fisks had other plans for the area where LaRock's house stands.

Similarly, the Fisks offered no direct evidence of "discomfort and annoyance" from LaRock's house.  Indirectly, their testimony established mostly that her house represents many years of hassle the Fisks and all parties would have preferred to avoid that came from this situation.  LaRock's trespassing house itself has not caused any measurable amount of that situation.

The court concludes that the Fisks have failed to meet their burden of proof on damages resulting from LaRock's trespass.  *E.g.*, *Kennedy v. Williams*, 114 Vt. 54, 57 (1944) ("That the [claimant] had the burden of proof is elementary.").  The court will not award any.

## III.    Order

For the reasons set forth above, the court will enter judgment:

On count 3 (unjust enrichment), for the Fisks of $0;
On count 4 (private nuisance), for the Fisks of $0;
On counterclaim 1 (trespass), for the Fisks of $0; and
On counterclaim 3 (unjust enrichment), for Larock of $0.

Through counsel, the parties may arrange for LaRock to return to the Fisks's River Road property to retrieve her undisputed personal property.  If parties cannot reach an agreement, LaRock may file a motion.

Electronically signed pursuant to V.R.E.F. 9(d) on June 18, 2026.

Colin Owyang
Superior Court Judge